**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00053-REB-STV

DARIN MENAPACE,

     Plaintiff,

v.

ALASKA NATIONAL INSURANCE COMPANY,

     Defendant.

_____

**ORDER RE: DOCUMENTS WITHHELD OR REDACTED BY DEFENDANT
PURSUANT TO ATTORNEY-CLIENT PRIVILEGE AND/OR WORK PRODUCT**
_____

Magistrate Judge Scott T. Varholak

     This matter is before the Court on the parties' discovery dispute regarding documents withheld or redacted by Defendant as attorney-client privileged and/or protected by the work produce doctrine.  The Court has carefully considered the Parties' briefing, arguments made at the April 23, 2020 hearing, and the applicable law.  For the reasons discussed herein, the Court **ORDERS** Defendant to produce certain of the documents previously withheld or redacted as protected by the attorney-client privilege and/or work product doctrine as set forth in Appendix A to this Order.

**I.    BACKGROUND[1]**

     The instant lawsuit arises from a claim for underinsured motorist ("UIM") benefits made by Plaintiff Darin Manapace to his employer's insurer, Defendant Alaska National

_____

[1] The Court draws factual allegations from the Complaint [#5] and the parties' briefing and exhibits to provide context for resolution of the instant dispute.  When available, the Court cites to the publicly available docket.  For references to the claim file not included in the

Insurance Company.  [#5]  On July 16, 2016, Plaintiff was involved in a motor vehicle collision in Wyoming when the driver of another vehicle, Sharon Johnson, crossed the center line into the oncoming lane of travel and collided head-on with Plaintiff's vehicle. [*Id.* at ¶¶ 5, 6]  At the time of the collision, Ms. Johnson was insured by USAA with policy limits of $100,000.  [*Id.* at ¶¶ 7, 8]  At the time of the collision, Plaintiff was acting within the scope of his employment with Alaskan Brewing, LLC, and thus was an insured under Alaskan Brewing's underinsured motorist insurance policy with Defendant in the amount of $1,000,000 per accident for bodily injury coverage.  [*Id.* at ¶¶ 11, 12, 13]  Although the collision occurred in Wyoming, Plaintiff resided and worked for Alaskan Brewing in Colorado and drove an Alaskan Brewing vehicle insured by Defendant.  [#51 at 11]

Because Plaintiff's damages and losses from the collision exceeded $100,000, on August 16, 2017, Plaintiff—through counsel, Alana Anzalone—made a claim for UIM benefits to Defendant.[2]  [#5, ¶¶ 9, 10; #51-1 at 2-3]  Scott Millar, a Senior Claims Examiner for Defendant, was assigned to adjust the claim.  [#51 at 11; #51-1 at 5]  At the time of Plaintiff's claim, Defendant, which primarily provides commercial insurance in Alaska and the Pacific Northwest, had handled only four Colorado UIM claims and 11 total Colorado auto claims.  [#51 at 10-11]  As a result, in July 2017, Defendant retained outside counsel in Colorado—Keith Olivera with the law firm White & Steele, P.C.—to provide advice in connection with the adjustment of the claim.  [#51 at 11; #51-3, ¶¶ 3-4, 6]

---

public record [*see* #51-2 ("Due to Size Exhibit B Submitted Directly to Court via FTP site")], the Court cites to the Bates number of the document (*e.g.*, AlaskaNational_000000).

[2] Contemporaneously, Plaintiff was also pursuing a claim for workers compensation from Defendant—who was also Alaskan Brewing's workers compensation carrier.  [*See, e.g.*, #51-1 at 4; AlaskaNational_000214]

In October 2017, Ms. Anzalone notified Mr. Millar that USAA had offered policy limits of $100,000 and requested consent to settle.  [#51-1 at 4]  On November 27, 2017, Mr. Millar sent a letter to Ms. Anzalone on behalf of Defendant "consent[ing] to the underlying settlement [with USAA] and the satisfactory triggering required to present a UM/UIM claim for review under the . . . policy."  [#51-1 at 9]

On June 21, 2018, Ms. Anzalone sent Mr. Millar a nine-page letter making a demand in the amount of $500,000 and explaining the basis for that demand.  [#51-1 at 13-21]  Mr. Millar responded on July 2, 2018, requesting an examination under oath ("EUO"), potentially an independent medical examination ("IME"), and a mediation.  [#51-1 at 41]  Mr. Millar informed Ms. Anzalone that Defendant "retained Keith Olivera in Denver to work with you to get the EUO and any IME promptly completed."  [*Id.*]  From that point forward, Mr. Olivera "replace[d] Mr. Millar as the primary point of contact for Plaintiff's counsel."  [#51 at 34]  At Defendant's request, Mr. Olivera "t[ook] the lead" and "coordinate[d]" the EUO, IME, and mediation with Ms. Anzalone on behalf of Defendant. [#53-7 at 2; *see generally* AlaskaNational_000227-39]  On or about August 20, 2018, Mr. Olivera conducted the EUO of Plaintiff on behalf of Defendant.  [*See* #53-4 at 16-18; AlaskaNational_000400]  In September 2018, Plaintiff submitted to an IME requested by Defendant through Mr. Olivera.  [#53-4 at 13]  On or about October 17, 2018, Plaintiff and Defendant participated in a mediation of the claim but were unsuccessful in reaching a mutually agreeable settlement.  [#51-1 at 28]  Following the mediation, on October 25, 2018, Defendant made a payment in the amount of $150,000 in UIM benefits to Plaintiff, which Plaintiff contends is an amount less than the full value of his claim.  [#5, ¶ 15; #51-1 at 28; AlaskaNational_000397]

Between January 2019 and August 2019, Mr. Olivera and Ms. Anzalone exchanged numerous communications regarding additional medical records provided by Plaintiff and Defendant's desire to have those records reviewed by an orthopedic surgeon in order to "complete its updated evaluation of [Plaintiff's] claim." [#53-4 at 6-7; *see generally id.* at 2-11] On October 4, 2019, Mr. Millar sent a letter to Ms. Anzalone, contending that Defendant "believe[s] that [Plaintiff] has received fair and reasonable compensation for his liability and UIM claims arising from the accident with the payment of $100,000 from [USAA] and $150,000 from [Defendant] for the UIM claim," but noted that Defendant "would like to continue to move this matter towards a compromise resolution" and requested any updated medical information and invited Plaintiff to submit a "reasonable settlement demand." [#51-1 at 42]

On December 5, 2019, Plaintiff filed the instant lawsuit in the District Court for the County of Denver, Colorado asserting claims against Defendant for breach of contract, undue delay or denial pursuant to Colorado Revised Statutes §§ 10-3-1115 and 10-3-1116, and bad faith breach of contract. [#5] On January 7, 2020, Defendant removed the lawsuit to this Court. [#1] Upon removal, Senior District Judge Robert E. Blackburn referred the case to this Court to, among other responsibilities, "resolve discovery matters." [#9]

Pursuant to the discovery dispute procedure set forth in this Court's Civil Practice Standards, the Court conducted a discovery hearing on April 23, 2020 to address discovery disputes raised by the parties. [#42, 50] In advance of the hearing, on April 15, 2020, the parties submitted brief statements setting forth the issues in dispute, which included a dispute with regard to documents related to Mr. Olivera's involvement with the

claim that Defendant withheld or redacted pursuant to the work product and/or attorney-client privilege protections.  In connection with that dispute, Defendant also submitted a privilege log and provided the documents for *in camera* review by the Court.  At the conclusion of the hearing, the Court ordered the parties to file supplemental briefing with regard to the documents withheld or redacted by Defendant.[3]  [#42, 50]

On May 21, 2020, Defendant filed its Brief in support of Attorney-Client Privilege and Work-Product Protection (Defendant's "Brief").  [#51]  On that same date, Defendant submitted to the Court via email a revised privilege log and revised set of redacted and withheld documents for *in camera* review.  On June 4, 2020, Plaintiff filed his Response to Defendant's Brief (Plaintiff's "Response") [#53], and, on June 11, 2020, Defendant filed its Reply in Support of Attorney-Client Privilege and Work-Product Protection (Defendant's "Reply") [#57].  On September 11, 2020, the Court granted Plaintiff's request to submit additional evidence in support of Plaintiff's Response.  [#82, 83, 84]  On September 18, 2020, Defendant filed a response to the supplemental evidence submitted

---

[3]  At the hearing, the Court ruled that Defendant would not be permitted to take the deposition of Ms. Anzalone.  [#42]  Defendant inquired whether the Court would also entertain supplemental briefing on that issue, and the Court responded that the issue was "decided" and instructed the parties to "focus on" only the issues surrounding Defendant's assertion of attorney-client privilege and work product.  [#50 at 22:15-22]  Despite that instruction, Defendant's supplemental brief renews Defendant's argument that Ms. Anzalone's communications and actions during the adjustment of the claim may not be subject to the attorney-client privilege or work product protection.  [#51 at 35-37]  The Court's ruling at the April 23, 2020 Hearing with regard to the deposition of Ms. Anzalone stands, and the Court declines Defendant's invitation to revisit that issue.  To the extent Defendant requests that the Court "require disclosure of Ms. Anzalone's documents and files" [#57 at 18], the issue of the production of Ms. Anzalone's documents is not properly before the Court and the Court does not have the information (*e.g.*, privilege log, *in camera* review of documents) necessary to rule on that issue.

by Plaintiff [#87] and a Notice of Supplemental Authority in support of Defendant's Brief [#91].

## II.   ANALYSIS

The parties dispute the applicability and scope of the attorney-client privilege and work product doctrine with regard to documents redacted and/or withheld by Defendant based upon Mr. Olivera's involvement in Plaintiff's claim for UIM benefits.  The Court addresses the application of each doctrine below.

### A.   Attorney-Client Privilege

#### 1.   Legal Standard

Because subject matter jurisdiction in this matter is based upon the Court's diversity jurisdiction [#1, ¶¶ 11-14], state law controls issues of privilege, including application of the attorney-client privilege, Fed. R. Evid. 501.[4]  Pursuant to Colo. Rev. Stat. § 13-90-107(1)(b), "[a]n attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment."  Although now codified, "the privilege originated in the common law, and much of the common law jurisprudence pertaining to the privilege is retained."  *People v. Tucker*, 232 P.3d 194, 198 (Colo. App. 2009).  "The purpose of the attorney-client privilege is to secure the orderly administration of justice by insuring candid and open discussion by the client to the attorney without fear of disclosure."  *Losavio v. Dist. Court In & For Tenth Judicial Dist.*, 533 P.2d 32, 34 (Colo. 1975).

---

[4] The Court notes that much of Defendant's discussion of the application of the attorney-client privilege relies on court decisions applying federal law or the laws of other states and thus is of limited value given that Defendant makes no attempt to compare the law being applied in those cases to the law of privilege in Colorado.  [*See, e.g.*, #51 at 13-16, 21-23; #57 at 1-3]

"The attorney-client privilege applies to confidential matters communicated by or to the client in the course of obtaining counsel, advice, or direction with respect to the client's rights or obligations." *People v. Trujillo*, 144 P.3d 539, 542 (Colo. 2006) (quotation omitted). "[T]he attorney-client privilege protects not only information and advice communicated from the attorney to the client, but also information given to the attorney to enable him to give sound and informed legal advice." *Gordon v. Boyles*, 9 P.3d 1106, 1123 (Colo. 2000). The privilege, however, "protects only the communications to the attorney; it does not protect any underlying and otherwise unprivileged facts that are incorporated into a client's communication to his attorney." *Id.*

The attorney-client privilege "is established by the act of a client seeking professional advice from a lawyer and extends only to confidential matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations." *Tucker*, 232 P.3d at 198. Moreover, "the privilege 'applies only to statements made in circumstances giving rise to a reasonable expectation that the statements will be treated as confidential.'" *Id.* (quoting *Wesp v. Everson*, 33 P.3d 191, 197 (Colo. 2001)). Thus, in order for the privilege to apply, the communication must both relate to the provision of legal advice and be made confidentially.

"No blanket privilege for all attorney-client communications exists" but instead "the privilege must be claimed with respect to each specific communication and, in deciding whether the privilege attaches, a trial court must examine each communication independently." *Wesp*, 33 P.3d at 197. "The burden of establishing that a particular communication is privileged rests on the party asserting the privilege." *Id.* at 198.

Even where the attorney-client privilege does apply, however, its protections are not absolute.  "The client may impliedly or expressly waive the privilege that attaches to a protected communication." *Id.*  "To prove an implied waiver, there must be evidence showing that the privilege holder, by words or conduct, has impliedly forsaken his claim of confidentiality with respect to the communication in question." *Id.* (quotation omitted). "[A] client impliedly waives the privilege when he or she (1) discloses privileged communications to a third party or (2) asserts a claim or defense focusing on advice given by the attorney, thereby placing the allegedly privileged communications at issue." *State Farm Fire & Cas. Co. v. Griggs*, 419 P.3d 572, 575 (Colo. 2018).  "[T]he fact that privileged information might become relevant in a given lawsuit could not alone be enough to establish an implied waiver," but, instead, it must be shown "that the client asserted a claim or defense that *depends on* privileged information." *Id.* (emphasis in original).  "The burden of establishing such a waiver rests with the party seeking to overcome the privilege." *Wesp*, 33 P.3d at 197.

### 2.    Application

In their briefing, the parties both argue for the application of bright line rules that they contend would apply to all of the documents Defendant withheld or redacted based upon attorney-client privilege as a result of Mr. Olivera's involvement with Plaintiff's insurance claim.  The Court acknowledges that there is some appeal to the application of a bright line rule.  As courts have recognized, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Wesp*, 33 P.3d at 201 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)).  As the United States Supreme Court acknowledged in *Upjohn*,

however, "no abstractly formulated and unvarying 'test' will necessarily enable courts to decide [privilege] questions . . . with mathematical precision."  449 U.S. at 393.  The Colorado Supreme Court "ha[s] consistently stressed that no blanket privilege for all attorney-client communications exists."  *DCP Midstream, LP v. Anadarko Petroleum Corp.*, 303 P.3d 1187, 1199 (Colo. 2013).  With these principles in mind, the Court considers the parties' arguments for the application of a bright line rule to the facts of this case.

### a.   Defendant's Arguments for a Bright Line Rule

Defendant contends that "each of the redacted communications helped ensure that its adjustment and investigation of [Plaintiff's] claim complied with Colorado law—a quintessential legal purpose."  [#51 at 23]  According to Defendant, "the fact that some of Mr. Olivera's actions and communications also helped [Defendant] adjust the claim <u>does not</u> change the result," and "[t]o hold that such communications lose their privileged nature merely because they also relate to the ordinary course of [Defendant's] business (claims handling and investigation) would create an attorney-client privilege rule unique to the insurance industry that discourages insurance companies from utilizing resources for law compliance."  [*Id.* at 22-23 (emphasis in original)]  Instead, Defendant argues that "[w]hen communications contain both a legal and business purpose, courts 'should determine whether obtaining or providing legal advice was one of the significant purposes of the attorney-client communication.'"  [*Id.* at 22-23 (quoting *Fed. Trade Comm'n v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018)).

Notably, however, none of the authority Defendant cites for the application of this "significant purpose" test applies Colorado law or arises in the insurance context.  Outside

of the insurance context, other courts in this District considering communications that have both a legal and business purpose have looked to see whether the legal purpose was the "dominate purpose" or "predominate[d]" over the business purpose or instead whether the legal purpose was "merely incidental" to the business purpose. *See, e.g.*, *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-CV-1301-PAB-GPG, 2018 WL 3055774, at *3 (D. Colo. May 23, 2018) (holding that "[w]here business and legal advice are intertwined, the legal advice must predominate for the communication to be protected" and "[w]hen the legal advice is merely incidental to business advice, the privilege does not apply" (quotations omitted)); *Bonanno v. The Quizno's Franchise Co., LLC*, No. 06-CV-02358-WYD-KLM, 2008 WL 1801173, at *3 (D. Colo. Apr. 18, 2008) (finding that "the 'dominant purpose' of many of the communications appears to have been to provide legal advice and strategy to the corporation, although business advice and strategy [we]re also incorporated").

Most relevant to the instant dispute, however, are the numerous decisions applying Colorado law that have considered whether communications are subject to the attorney-client privilege where, as here, the insurer retained an attorney to assist in adjusting an insurance claim.  As Defendant itself acknowledges these decisions uniformly have held "that insurance companies cannot claim privilege when an attorney is acting as a claim adjuster, rather than counsel."   [#51 at 23-25 (citing cases); *see also* #57 at 4 (acknowledging that the Colorado Supreme Court has "recognized the unremarkable principle that communications are not privileged when a lawyer is acting as a claim investigator, rather than legal counsel")]  A review of these decisions is instructive.

In *National Farmers Union Property & Casualty Co. v. District Court for the City and County of Denver* ("*National Farmers*"), the Colorado Supreme Court considered the propriety of an insurer's assertion of attorney-client privilege and work product protection for a memorandum "prepared by outside counsel to inform [the insurer's] general counsel of the results of an investigation as to the facts regarding issuance of the policy and conclusions regarding whether a claim under the policy should be paid."  718 P.2d 1044, 1045-46 (Colo. 1986).  The court found that the attorneys who prepared the memorandum "were performing the same function a claims adjuster would perform, and the resulting report [thus was] an ordinary business record of the insurance company."  *Id.* at 1048; *see also id.* at 1049 (finding that, in conducting interviews to determine "the factual circumstances underlying the issuance of the policy . . . the attorneys were acting more in the role of claims investigator than legal counsel").  The court concluded that "the attorney-client privilege [did] not protect [the portion of the memorandum ordered to be produced] because the information contained therein was not legal advice but the results of a factual investigation relating to the issuance of a policy."  *Id.* at 1049.  The court further indicated that the trial court had "correctly determined" that "[t]he portion of the memorandum which contain[ed] legal conclusions and a subsequent memorandum of a legal nature" were properly withheld.  *Id.*

In *Munoz v. State Farm Mutual Automobile Insurance Company*, an insurer argued that the trial court erred by allowing the plaintiff to discover "documents containing information that was privileged, either because it reflected communications between [the insurer] and its attorney or because it was a part of its 'work product.'"  968 P.2d 126, 130 (Colo. App. 1998).  The Colorado Court of Appeals observed, however, that "if a lawyer

is acting in an investigative capacity, and not as a legal counselor, with reference to whether an insurance claim should be paid, then neither the [attorney-client] privilege . . . nor the work product privilege protects communications from a lawyer to an insurance carrier." *Id.* The court further noted that the insurer "presented no evidence as to the role that the lawyer was playing at the time the recommendation to pay was made nor as to the circumstances surrounding that recommendation." *Id.* Ultimately, the court refrained from deciding whether the documents at issue should have been protected from discovery, because the court found that there was no showing of prejudice resulting from their production. *Id.*

In *Fiechtner v. American Family Mutual Insurance Company*, an insurer sought to exclude evidence related to its in-house counsel's involvement in the evaluation and adjustment of the plaintiff's insurance claim after the plaintiff initiated the litigation. No. 09-CV-02681-WJM-MEH, 2011 WL 4087296, at *1 (D. Colo. Sept. 13, 2011). The court found that, although the in-house counsel "was acting as an attorney with respect to some of his duties, and that some of his resulting actions or communications would therefore be privileged, at least to some extent, [the attorney] was acting as a claims adjuster rather than an attorney" and that the attorney's "actions in [that] capacity [we]re not protected by any attorney privilege or work-product doctrine." *Id.* at *2. The court thus permitted the plaintiff "to introduce evidence related to [the attorney's] post-litigation conduct to the extent it involve[d] [the attorney's] activities as a claims adjuster rather than an attorney." *Id.*

In *Colorado Mills, LLC v. Philadelphia Indemnity Insurance Company*, an insurer asserted attorney-client privilege over "certain documents contained in the insurance

12

claim file, claim notes, and correspondence that reveal[ed] communications" between the insurer and counsel it retained "to investigate whether [a] claim was covered under the policy."   No. 12-CV-01830-CMA-MEH, 2013 WL 1340649, at *1, *4 (D. Colo. Apr. 2, 2013).  Without citation to any legal authority, the insurer argued that "'coverage analysis' . . . is different than claim investigation and, thus, any communication concerning coverage analysis [wa]s privileged and properly withheld."  *Id.* at *4.  Upon reviewing the withheld documents, the court concluded that the insurer "was not solely seeking legal advice from [the attorneys] as counsel but, rather, [the insurer] largely sought factual information and an evaluation concerning whether [the plaintiff's] claims were covered," which the Court observed was "the same type of investigation and evaluation" that insurance claims adjustors typically undertake.  *Id.* The court further found that although the insurer's claim representative "testified that she sought 'advice' from [counsel] on certain occasions, a review of the documents reveal[ed] that any such advice with respect to coverage actually consist[ed] of [counsel's] evaluation of its investigation."  *Id.* at *5.

        In *Plaza Insurance Company v. Lester* ("*Plaza*"), the court found that "most, but not all of the documents submitted for [the court's] *in camera* review f[e]ll within the attorney-client privilege," because the attorneys retained by the insurer "provided legal advice and opinion as to the UIM claim made in conjunction with [the policy beneficiary's] death and concerning [the insurer's] exposure and legal obligations pursuant to Colorado law regarding the Policy."  No. 14-CV-01162-LTB-CBS, 2015 WL 3528336, at *5 (D. Colo. June 4, 2015).   Despite that finding, however, the court conducted a document-by-document review of the documents submitted for *in camera* review.  *Id.* at *5-6.  Based upon that review, the court concluded that the retained counsel's "initial efforts were often

investigative and non-legal in nature," including communications that "simply direct[ed] the [attorneys] to collect police files or court records," and that communications related to those non-legal, investigative activities were not entitled to the protections of the attorney-client privilege.  *Id.* at *5.

In *Ivan v. AIG Property Casualty Company*, the plaintiff sought to compel "claim notes and correspondence" between an insurer and its outside counsel regarding the insured's claim.  No. 17-CV-01906-PAB-MEH, 2018 WL 11182728, at *1 (D. Colo. Feb. 13, 2018).  The court rejected the insurer's contention that its attorney had solely acted as counsel to the insurer and had not been involved in adjusting the plaintiff's claim.  *Id.* at *2.  More specifically, the court found "that some of [the insurer's] redactions and withheld documents relate[d] to communications [its outside counsel] made while acting as a claims adjuster or investigator," including communications related to the outside counsel's requests for the claimant's medical records and communications from the outside counsel to the insurer providing a detailed factual summary of those medical records.  *Id.*  The court concluded that even if "[the outside counsel] gathered factual information to analyze [the insurer's] legal exposure, compiling basic factual information from [the claimant's] disclosed medical providers and presenting significant detail regarding those findings to [the insurer] are not protected by the attorney-client privilege," because "the attorneys were acting in their role as claims investigators when they gathered the factual information."  *Id.* at *3.  The court further found, however, that some of the withheld documents "discuss[ed] tasks [the outside counsel] performed in its role as counsel"—including the outside counsel's "use of the factual information to provide

legal advice"—and thus those documents were entitled to protection under the attorney-client privilege.  *Id.*

In *Olsen v. Owners Insurance Company*, an insurer asserted attorney-client privilege and work product protection over claim notes reflecting communications between a claims adjuster and an in-house counsel related to the plaintiff's insurance claim.  No. 18-CV-1665-RM-NYW, 2019 WL 2502201, at *1, *4 (D. Colo. June 17, 2019).  The insurer argued that, even to the extent the communications related to the claims handling process, "the communications concerned limiting [the insurer's] liability in any subsequent litigation" and were "shrouded by th[e] ever-present threat of liability for bad faith claims handling."  *Id.* at *4.  The court observed that the insurer essentially sought the imposition of a "categorical rule that the attorney-client privilege protects *all* communications between an attorney and claims adjuster because they 'are actually shrouded by this ever-present threat of liability for bad faith claims handling.'"  *Id.* at 4 n.2.  The court rejected the invitation to adopt such a categorical rule, noting that the insurer failed to cite any authority for it and the case law did not support it.  *Id.*  Instead, the court focused its inquiry "on the substance of [each] communication" between the claims adjuster and the attorney to determine whether "legal advice [wa]s sought and exchanged" in which case the privilege applied or whether the "attorney [wa]s acting in a different capacity, *i.e.*, . . . as a claims handler" in which case the privilege would not apply.[5]  *Id.* at *5.

_____

[5] The Court is aware that there is a pending objection to the court's order in *Olsen*.  [*See* #51 at 24 n.6]  Nonetheless, the Court finds *Olsen* instructive to the extent it follows the consistent approach taken by courts applying Colorado law to reject categorical rules where an attorney participated in the claims handling process and instead evaluate each specific withheld document to determine whether the communication involved relates to

These decisions thus stand for the proposition that, where an insurer utilizes an attorney to both handle claims adjusting activities and also to provide legal advice, the communications related to the claims handling functions (such as investigation, gathering and summarizing information, and valuation of the claim) are ordinary business activities of the insurance company typically handled by an adjuster or investigator and thus are not entitled to attorney client privilege. However, communications related to the actual provision of legal advice are still protected by the attorney-client privilege. These cases further make clear that, even where an attorney participates in claims adjusting activities to further their ability to offer legal advice (*e.g.*, by investigating the factual basis for the claim), communications related to those claims adjusting activities still are not entitled to the protections of the attorney-client privilege. *See, e.g.*, *Ivan*, 2018 WL 11182728, at *3 (finding that even if "[the outside counsel] gathered factual information to analyze [the insurer's] legal exposure," the compilation and summary of that information was not protected by the attorney-client privilege, because "the attorneys were acting in their role as claims investigators when they gathered the factual information"); *Colorado Mills*, 2013 WL 1340649, at *4-5 (rejecting privilege assertion with regard to communications involving type of "factual information and . . . evaluation concerning whether [the claimant's] claims were covered" that is typically performed by claims adjusters, but allowing insurer to withhold communications related to specific legal advice); *Nat'l Farmers*, 718 P.2d at 1049 (concluding that the attorney-client privilege did not protect

---

the attorney's provision of legal advice or instead relates to the adjustment of the claim. The Court has not reviewed the specific documents at issue in *Olsen* and thus does not rely on *Olsen's* more specific holdings as to whether particular documents or types of documents qualify for protection under the attorney-client privilege.

the portion of a legal memorandum addressing the investigation into the claim, but that "[t]he portion of the memorandum which contain[ed] legal conclusions" was properly withheld).

Defendant seeks to distinguish these cases by arguing that "none of these cases involved uncontroverted evidence establishing that a primary purpose of the communications was to provide legal advice," whereas "Mr. Olivera's under-oath declaration . . . proves that all of the communications either directly provided legal advice or furthered Mr. Olivera's ability to render legal advice." [#51 at 24 (emphasis in original)] The Court disagrees both (1) that Mr. Olivera's declaration is sufficient to prove that "the primary purpose" of all of the communications related to Mr. Olivera's provision of legal advice and (2) that his declaration is uncontroverted. Much of Mr. Olivera's declaration consists of self-serving overbroad and conclusory statements that provide little assistance to the Court.[6] For example, Mr. Olivera declares that "[t]he tasks that [he] performed for [Defendant] all served the purpose of providing legal advice to [Defendant] as to how the requirements of Colorado law apply to the facts of the case and how to act consistent with Colorado law." [#51-3, ¶ 7] Upon review of the claim file, although it is clear that Mr. Olivera did perform certain tasks that served the purpose of providing legal advice, it is

---

[6] The Court considers Mr. Olivera's testimony with regard to specific conversations that purportedly relate to the documents Defendant has withheld or redacted in the Court's individualized review of those documents. [*See* Appendix A; *but see infra* note 23] The Court notes, however, that much of that testimony also relies upon conclusory statements. [*See, e.g.*, #51-3, ¶ 11(ff) ("Between October 4, 2019 and December 10, 2019, I had numerous conversations with [sic] exchanged emails with [Defendant] that all related to proceeding with the claim in a manner consistent with the requirements of Colorado law or the status of anticipated litigation."); Appendix A, notes 3, 9, 11, 13]

also clear that not all of the tasks performed by Mr. Olivera served that purpose.[7]   As noted above, Defendant tasked Mr. Olivera with "tak[ing] the lead" and "coordinat[ing]" the EUO, IME, and mediation with Ms. Anzalone.   [#53-7 at 2]   Defendant also "had [Mr. Olivera] replace Mr. Millar as the primary point of contact" for requesting information from and providing information to Plaintiff.   [#51 at 34; *see* AlaskaNational_000227-39] Obviously, these tasks related to coordinating and communicating with Ms. Anzalone are the types of tasks typically performed by a claims adjuster and were not all undertaken for "the purpose of providing legal advice to [Defendant]."   Similarly, Mr. Olivera states in his Declaration that "[a]ll of my emails to and phone calls with the representatives of [Defendant] are communications that are protected by the attorney-client privilege."   [#51-3, ¶ 9]   Contrary to this representation, however, Defendant has not claimed a privilege with regard to all of Mr. Olivera's communications with Defendant.     [*See, e.g.*, AlaskaNational_000215 (9/4/2019 claim note summarizing call with Mr. Olivera regarding

---

[7] The supplemental authority submitted by Defendant, *Frias v. Auto-Owners Insurance Company*, No. 19-cv-00903-WJM-SKC (D. Colo. Sept. 1, 2020), thus is distinguishable. [#91-1]   In *Frias*, an insurer retained an attorney "to help during the time Defendant investigated and adjusted Plaintiffs' insurance claims" and that attorney prepared a 35-page letter for the insurer "replete with legal analyses and legal advice."   [*Id.* at 3, 8] Based upon the facts in that case, as informed by the letter prepared by counsel, the court concluded that the attorney was retained "as a lawyer" and that the lawyer "did not function as a claims handler."   [*Id.* at 8-9]   The court thus found that proposed Rule 30(b)(6) deposition topics regarding communications between the attorney and the insurer "either infringe[d] upon the attorney-client privilege or encompass[ed] matters not relevant to any claims or defenses."   [*Id.* at 9]   Here, although Mr. Olivera prepared a memorandum for Defendant that—similar to the letter in *Frias*—was "replete with legal analyses and legal advice," that memorandum was not prepared until January 2020—two and a half years after Mr. Olivera was initially retained to assist Defendant with Plaintiff's insurance claim.   Moreover, there is no indication in the *Frias* decision that the attorney retained in that case took an active role in the adjustment of the insured's claim as Mr. Olivera did here by becoming the primary point of contact between the insurer and the claimant and taking sole responsibility for the EUO and coordinating the IME.

results of IME); AlaskaNational_000215-16 (8/16/2019 email from Mr. Olivera to Mr. Millar attaching IME reports); AlaskaNational_000312 (6/03/2019 claim note summarizing call with Mr. Olivera that is only partially redacted); AlaskaNational_000396 (11/28/2018 claim note summarizing call with Mr. Olivera regarding status of UIM claim and communications with Ms. Anzalone)]  In addition to highlighting the inadequacy of Mr. Olivera's overbroad and conclusory testimony, these documents from the claim file (and others discussed in more detail in Appendix A) controvert certain of the statements made by Mr. Olivera in his declaration.  The Court thus finds that Mr. Olivera's Declaration is insufficient to establish that all of the tasks he performed and communications he had with Defendant were undertaken for the "primary purpose" of providing legal advice.  *See  Colorado Mills*, 2013 WL 1340649, at *5 (finding that although the insurer's claim representative "testified that she sought 'advice' from [counsel] on certain occasions, a review of the documents reveal[ed] that any such advice with respect to coverage actually consist[ed] of [counsel's] evaluation of its investigation").

Defendant also argues that "it is immaterial that [Mr. Olivera's communications related to the IME and EUO] may have also served an ordinary business purpose," because the evidence allegedly "is undisputed that Mr. Olvera's role in the IME and EUO process was primarily to assist him in providing legal advice regarding [Defendant's] duties under Colorado law."  [#51 at 21 n.5]  Defendant contends that Mr. Olivera's involvement in the IME and EUO "furthered Mr. Olivera's ability to obtain information necessary for him to provide legal advice regarding proceeding with and valuing the claim

consistent with Colorado law."[8]  [#51 at 20-21]   The Court disagrees with this self-serving

characterization.  Based upon the contemporaneous documentation, the primary purpose

of the IME and EUO was to obtain the information necessary for Defendant to validate

and adjust Plaintiff's claim.  [#51-1 at 41 (email from Mr. Millar to Ms. Anzalone requesting

IME and EUO as part of the "additional investigation" and "more information" Defendant

needed to evaluate Plaintiff's demand)]  Moreover, Defendant did not merely seek specific

legal advice from Mr. Olivera with regard to the requirements under Colorado law for the

conduct of an IME and EUO but rather delegated the entire IME and EUO process (and

other claims handling tasks) to Mr. Olivera.  [*Id.*; #53-7 at 2]  As such, Mr. Olivera clearly

was performing functions typically handled by a claims adjustor and not merely providing

legal advice.   The exception proposed by Defendant, which would protect all

communications related to "obtain[ing] information necessary for [the attorney] to provide

legal advice regarding proceeding with and valuing [a] claim" would seemingly provide

attorney-client privilege protection to every communication between an attorney to whom

---

[8] Defendant's reliance on *U.S. Specialty Ins. Co. v. Capitol Films U.S., LLC* ("*US Specialty*") is misplaced.   [See #51 at 21 (quoting No. CV 07 7206-AHM (AGRX), 2008 WL 11340369, at *2-3 (C.D. Cal. Oct. 7, 2008))]  As an initial matter, *US Specialty* involved an application of California, not Colorado, law.  2008 WL 11340369, at *2.  Regardless, *US Specialty* held only that "[w]ithout more, the mere fact that [the attorney] conducted EUOs does not create an inference that [the attorney] is a claims adjuster."  *Id.*  In rejecting the argument that the attorney had acted as a claims adjustor in conducting the EUOs, the *US Specialty* court expressly noted that the claims adjusters had also appeared at the EUOs.  *Id.*  Here, by contrast, Mr. Olivera's role in adjusting Plaintiff's claim extended far beyond just taking the EUO and it appears that neither Mr. Millar nor any other Defendant employee even attended the EUO.   [*See* #53-4 at 16-18; AlaskaNational_000399-400] Similarly, Defendant relies upon *Hartford Fin. Servs. Grp., Inc. v. Lake Cty. Park & Recreation Bd.*, but that case involved the application of Indiana law and the court expressly found that the attorney was not "retained to act in the capacity of an agent other than an attorney such as a type of 'outside claims adjuster' or to give simple business advice."  717 N.E.2d 1232, 1236 (Ind. Ct. App. 1999).

an insurer has delegated claims adjustment responsibilities and the insurer. Defendant provides no authority for such a sweeping exception, and—as established by the cases discussed above—such is clearly not the law in Colorado. Thus, "regardless of whether [Mr. Olivera] gathered factual information [from the EUO and IME] to analyze [Defendant's] legal exposure," Mr. Olivera's communications with Defendant relaying the information obtained through the EUO and IME are not privileged, because Mr. Olivera "w[as] acting in [his] role as claims investigator[ ] when [he] gathered th[at] factual information." *Ivan*, 2018 WL 11182728, at *3. To the extent Defendant requested— and/or Mr. Olivera provided—legal advice based upon that information, the Court agrees that those communications seeking or providing the legal advice would be entitled to attorney-client privilege protection. The Court disagrees, however, that Defendant may shroud all of Mr. Olivera's communications related to the EUO and IME process with the protections of the attorney-client privilege merely because his involvement was, in part, for the purpose of obtaining legal advice. *See Id.* (finding that "documents or communications detailing [counsel's] efforts to obtain [the claimant's] medical records and [counsel's] discussion of the relevant factual findings of such efforts" were not entitled to the attorney-client privilege, but "communications [the insurer] made for the purpose of obtaining legal advice or discussions detailing [counsel's] legal analysis of the case" were entitled to attorney-client privilege protection).

Defendant next seeks to distinguish this line of cases holding that no privilege attaches where an attorney is acting as a claims adjuster based upon Defendant allegedly being a "small insurance compan[y] with virtually no Colorado claims." [#51 at 24] Defendant contends that it was necessary for it to engage counsel to assist in adjusting

Plaintiff's claim, because Defendant had very limited experience adjusting claims in Colorado and thus it would be "difficult" for Defendant to provide its adjusters "anticipatory guidance on each and every intricacy of Colorado law based on the remote possibility that one claim adjuster might have to handle a Colorado insurance claim at some point during his tenure with the company." [*Id.* at 19] Defendant thus requests that the Court adopt a special rule for "smaller insurance companies who need to rely on the advice of counsel to provide insurance services to their clients."[9] [*Id.* at 19 n.4] None of the cases discussed above have based their decision to deny an insurer the protections of the attorney-client privilege where an attorney acted as an insurance adjuster on the size of the insurer or the number of claims it has handled in Colorado. Nor does Defendant offer any other authority for the distinction it asks this Court to draw.

The Court perceives no basis in law or as a matter of public policy to adopt a rule that provides extra protections to an insurer who offers insurance in the state of Colorado without the ability to adjust an insurance claim under that policy than it provides to an insurer who devotes the resources necessary to employ or contract an adjuster capable of adjusting the claim. Nor does Defendant offer any justification for why an insurer that engages an attorney because its adjusters lack the requisite knowledge to adjust a claim under Colorado law should be entitled to greater protections than an insurer that instead

---

[9] As an initial matter, the Court rejects the premise of Defendant's argument that, because of its size, it "need[ed] to rely on the advice of counsel to provide insurance services" to its clients. To the extent Defendant's adjusters did not have adequate experience to adjust claims in Colorado, rather than hire a Colorado attorney to assist in adjusting the claim, Defendant could have either (1) chosen not to insure vehicles/policyholders located in Colorado or (2) employed or contracted a claims adjuster with experience adjusting claims in Colorado.

contracts to engage an adjuster with the requisite knowledge.[10]   Such a rule would encourage insurers to avail themselves of this newfound privilege by retaining attorneys to conduct the tasks typically performed by claims adjusters and thus would be inconsistent both with the case law discussed above and with the rule "that insurers cannot escape their duty of good faith and fair dealing by delegating tasks to third parties." *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).

### b.    Plaintiff's Arguments for a Bright Line Rule

For his part, Plaintiff argues that none of the documents withheld or redacted based upon Mr. Olivera's involvement are entitled to attorney-client privilege protection, because an attorney's "'advice' with respect to how to adjust a particular insurance claim is neither 'legal' nor relates to 'confidential matters,' and so is not privileged in the first instance." [#53 at 2]   More specifically, Plaintiff argues that, as a result of an insurer's affirmative investigation, documentation, and disclosure obligations, "there can be no expectation of confidentiality as to what the insurer did to adjust the insured's claim and why, even if a lawyer was consulted." [*Id.* at 3]   Plaintiff contends that "advising

---

[10] Defendant contends that it is not trying to use the privilege to improperly shield communications related to its investigation and adjustment of Plaintiff's claim, and, in support, points out that it has not redacted or withheld communications between Mr. Millar and Defendant's in-house counsel regarding Plaintiff's claim. [#51 at 25 n.7]   Although the Court appreciates that Defendant has not improperly attempted to assert privilege over these communications, the fact that Defendant acknowledges that these communications are not privileged lends support to a finding that Defendant's communications with Mr. Olivera discussing the same issues also are not privileged. [*Compare* AlaskaNational_000367 (redacted claim note regarding communications between Mr. Millar and Mr. Olivera) *with* AlaskaNational_000369 (unredacted claim note regarding communications between Mr. Millar and in-house counsel)]   Defendant offers no basis for a finding that communications with outside counsel should receive greater protection than communications with in-house counsel and the Court is aware of none.

[Defendant] as to whether to deny a particular claim, or the 'value' of that claim, or what information is necessary to make such decisions, goes to the core business function of [Defendant], and is not 'legal advice.'" [*Id.* at 23]  Plaintiff thus proposes that the Court adopt the following bright-line rule:  "[W]here an insurer seeks advice from a lawyer that is not specific to the process of adjusting an insured's insurance claim (such as advice regarding how to create company-wide procedures to address a new development in the law), the advice should be deemed privileged," but "where an insurer voluntarily decides to involve a lawyer in assisting the insurer to take actions or make decisions specific to the insured's claim, there can be no expectation of confidentiality, the advice is not 'legal,' and the communications should not be considered privilege[d]."  [*Id.* at 5]  In essence, Plaintiff argues that where, as here, an attorney serves in a dual role—providing legal advice with regard to the claim and also performing tasks associated with adjusting the claim—none of the attorney's communications related to the claim are privileged.[11]

Plaintiff, however, provides no authority for such a sweeping, bright-line rule.  To the contrary, as discussed above, courts applying Colorado law have consistently found that, even where an attorney's involvement crosses the line into the role of claims adjuster, communications between the attorney and the insurer involving legal advice

---

[11] Plaintiff also argues that "to the extent the Court finds a waiver of privilege on the subject matter of adjusting (investigating or evaluating) Plaintiff's insurance claim, the waiver would extend to all communications between [Defendant] and Mr. Olivera related to adjusting Plaintiff's insurance claim."   [#53 at 9]    The Court's finding that communications related to Mr. Olivera's role in adjusting Plaintiff's insurance claim are not entitled to attorney-client privilege protection, however, is not premised upon waiver but rather a finding that such communications are not covered by the attorney-client privilege in the first instance.  As Plaintiff himself explained, where an attorney is acting as a claims adjuster, he is performing a business function rather than providing legal advice and thus his communications related to those activities are not privileged.  [#53 at 12-14, 22-24]

regarding the claim being adjusted are still protected by the attorney-client privilege. *See, e.g.*, *Nat'l Farmers*, 718 P.2d at 1049 (finding that trial court "reviewed the documents *in camera* . . . and correctly determined which document or portions thereof needed to be disclosed"); *Plaza*, 2015 WL 3528336, at *5-6 (conducting a document-by-document privilege analysis for documents submitted for *in camera* review); *Colorado Mills*, 2013 WL 1340649, at *4-5 (rejecting privilege assertion with regard to communications involving type of "factual information and . . . evaluation concerning whether [the claimant's] claims were covered" that is typically performed by claims adjusters, but allowing insurer to withhold communications related to specific legal advice that arose during adjustment of the claim).

The Court agrees with the approach taken in those cases. As an initial matter, such an approach comports with the requirement that courts consider privilege issues on a document-by-document basis. *See, e.g.*, *Wesp*, 33 P.3d at 197 ("[I]n deciding whether the privilege attaches, a trial court must examine each communication independently."); *DCP Midstream, LP*, 303 P.3d at 1199 (finding that Colorado legal precedent supports "document-by-document approach" to determining privilege). Moreover, as a matter of public policy, the Court finds that the bright line rule proposed by Plaintiff would discourage insurers from seeking the advice of counsel with regard to specific legal issues that may arise in the context of a specific claim and thereby may result in the misapplication of the law or a delay in the correct application of the law. To the extent Defendant requested that Mr. Olivera provide advice with regard to defining the applicable Colorado law or how courts have applied that law to facts similar to that presented by Plaintiff's claim, the Court believes that such advice is legal in nature. Upon receiving

that advice, it is then Defendant's business decision how to apply it to determine the value of Plaintiff's claim.  Following Plaintiff's logic, any time a client obtains and follows the advice of counsel to make a business decision, the advice would "not [be] 'legal,' and the communications [w]ould not be considered privilege[d]."   [#53 at 5]   Such a broad interpretation of waiver is unsupported in the law and would render the attorney-client privilege meaningless outside of the litigation context.  *See Wesp*, 33 P.3d at 196 ("[T]he right of parties . . . to consult professional legal experts is rendered meaningless unless communications between attorney and client are ordinarily protected from later disclosure."); *Shriver v. Baskin-Robbins Ice Cream Co.*, 145 F.R.D. 112, 114 (D. Colo. 1992) (finding that "communications between corporate counsel and company personnel are privileged so long as they concern matters within the scope of the employees' corporate duties"); *All. Const. Sols., Inc. v. Dep't of Corr.*, 54 P.3d 861, 866 (Colo. 2002) (same).

Plaintiff further argues that Defendant has waived any attorney-client privilege by "assert[ing] it had a reasonable basis for its claim activities (predicated upon the attorney's actions), disclaims knowledge that it acted unreasonably (an element of a bad faith claim), attempts to lend credibility to its conduct by referencing the fact that it hired counsel (a "stealth" advice of counsel defense), or asserts that it was materially and substantially prejudiced in its investigation of the claim by some failure to cooperate by Plaintiff."[12]  [#53

---

[12]  Plaintiff fails to provide any citation to the record to support his contentions that Defendant has predicated the reasonableness of its claim activities upon Mr. Olivera's actions or that Defendant has attempted to lend credibility to its conduct by referencing Mr. Olivera's involvement.   Although, in the context of the instant privilege dispute, Defendant understandably has referenced its consultation with Mr. Olivera on certain legal issues, Plaintiff has not pointed to any instances in which Defendant has referred to Mr. Olivera's legal advice to support its coverage decision either in Defendant's pre-

at 14]  Plaintiff contends that such waiver would "specifically include any communications wherein Mr. Olivera was involved in the investigation or evaluation of Plaintiff's insurance claim, or where he instructed the adjuster as to what to do."  [*Id.* at 15]  Although the Court agrees that "any communications wherein Mr. Olivera was involved in the investigation or evaluation of Plaintiff's insurance claim, or where he instructed the adjuster as to what to do" likely are not privileged, that is not because of the application of a waiver.  Instead, such communications would not be privileged in the first instance because in investigating and evaluating Plaintiff's claim (or "instructing" the adjuster what to do in that regard), Mr. Olivera would be acting as a claims adjuster and not as an attorney.

To the extent Mr. Olivera provided legal advice on a specific issue of Colorado law related to the adjustment of Plaintiff's claim, however, such communication would be privileged and that privilege is not necessarily waived as a result of Defendant denying bad faith or asserting a failure to cooperate defense.  The Court agrees with Defendant that Plaintiff has "entirely fail[ed] to explain how [the failure to cooperate] defense 'depends on privileged information.'"[13]  [#57 at 12 (quotation omitted)]  With regard to Defendant's denial of Plaintiff's bad faith claim, "the mere denial of an allegation does not

---

litigation claim adjustment communications or in response to Plaintiff's discovery requests.

[13] Plaintiff contends that, by asserting a failure to cooperate defense, Defendant "has placed what it knew, what it needed, what it did to obtain information, what it did with the information it had, and why it did not obtain additional information, directly at issue in the litigation (to the extent it is not already)."  [#53 at 15]  Plaintiff, however, has not pointed to any examples where Defendant has asserted that any such information is privileged. Seemingly, the most important evidence with regard to Defendant's failure to cooperate defense are the pre-litigation communications between Defendant and Plaintiff—none of which is claimed to be privileged.  Moreover, as explained, to the extend Mr. Olivera was performing tasks—such as requesting and obtaining information about Plaintiff's claim— associated with the adjustment of Plaintiff's claim, the Court agrees that communications related to those tasks are not privileged.

waive the attorney-client privilege" and Plaintiff has not demonstrated that his bad faith claim (or Defendant's denial of that claim) "*depends on* privileged information."[14]  *Griggs*, 419 P.3d at 575 (emphasis in original); *see also Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 630 (D. Colo. 1998) (finding that defendants' denial of the plaintiff's bad faith claim did not "amount to an affirmative act which supports an at issue waiver").

### c.   Denial of a Claim on a Purely Legal Basis

At the April 23, 2020 hearing, the Court asked the parties to address whether an insurer waives the attorney-client privilege by denying a claim on a purely legal basis after consulting with an attorney on the application of the law.[15]  [#50 at 12-13]  The Court explained that—in such instances—there is a tension between the interest of the insurer

---

[14] In *Stillwell v. Exec. Fund Life Ins. Co.*, the court found that, in considering a bad faith claim, "the fact-finder must consider how defendant handled plaintiff's claim" and thus "communications between defendant and its attorneys [in the insurer's claim file] may be vital to plaintiff's case." No. CIV. A. 89-A-245, 1989 WL 78159, at *5 (D. Colo. July 12, 1989).  The court made clear, however, that it was not adopting a bright-line rule that the privilege was waived as to all attorney-client communications where an insured has asserted a claim for bad faith. *Id.* at *5 n.2.  Instead, the court emphasized that "courts are in a position to refuse discovery of materials which are not relevant if, as in this case, an *in camera* inspection of the file is performed." *Id.* Here, the Court has conducted such a review and determined that Plaintiff's bad faith claim does not "depend on" any of the documents the court has permitted Defendant to withhold and/or redact as privileged.

[15] At the hearing, the Court also asked the parties to address whether Defendant may properly assert the attorney-client privilege if Mr. Olivera took the lead in adjusting Plaintiff's insurance claim such that the claims adjustor—Mr. Millar—served only as "a mouthpiece for [the attorney] who is doing the adjusting." [#50 at 10-11]  Upon review of the entire claim file, the Court finds it unnecessary to reach this issue in the context of this case.  Although Defendant made Mr. Olivera the "primary point of contact" for the claim [#51 at 34], Mr. Olivera and Mr. Millar remained in regular contact and Mr. Olivera kept Mr. Millar abreast of his communications with Ms. Anzalone.  [*See, e.g.*, AlaskaNational_000397-AlaskaNational_000405 (claim notes reflecting that Mr. Olivera promptly forwarded communications with Ms. Anzalone to Mr. Millar)]  More importantly, Mr. Millar maintained primary responsibility for adjusting the claim internally, including the preparation of four major loss reports and discussing strategies for settlement of the claim.  [*See, e.g.*, #51-1 at 22-37 (four major loss reports); AlaskaNational_000397 (9/18/2018 claim note mentioning discussion of "strategies for file resolution")]

in obtaining the advice of counsel and the interest of the insured in obtaining the reasoning behind the insurer's claim decision.  [*Id.*]  In response, Defendant argues that "[i]t would be improper and unnecessary to waive an insurance company's attorney-client privilege (and frustrate law compliance as a result)" in such circumstances.  [#51 at 26-27]  As Defendant points out, under Colorado law, the insurer is required "to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."  Colo. Rev. Stat. § 10-3-1104(1)(h)(XIV).  As a result, Defendant argues that, "to the extent a legal issue significantly affects the value of an insured's claim, the insurance company must explain that issue and the effect it has on the insured's claim."  [#51 at 26]  Defendant argues that an insurer may provide such an explanation "in its own voice" without waiving the attorney-client privilege.  [*Id.* at 26-27]  The Court agrees that—to the extent an insurer is able to articulate a sufficient explanation for its application of the law without expressly relying upon the advice of counsel or otherwise waiving the privilege attached to its communications with counsel on that subject—an insurer may be able to provide its insured a reasonable explanation of the legal basis for its decision without waiving the attorney-client privilege.  Indeed, there may be instances where the insurer's application of the law differs from the advice the insurer received from counsel.

Plaintiff contends that Defendant has waived any privilege regarding the advice provided by Mr. Olivera upon which Defendant based its coverage/reduction of benefits decision by acknowledging that it relied upon that advice to make its coverage decision.[16]

---

[16] Plaintiff acknowledges that Defendant has not asserted an advice of counsel defense, but contends that Defendant "has factually (and boldly) asserted that everything it did was based on 'advice of counsel' in its decisions on this claim, which will likely serve to

[#53 at 14 n.6]  The Court, however, does not believe that the current record supports waiver on this basis.  In refusing Plaintiff's $500,000 demand, Defendant provided Plaintiff an explanation that referenced Defendant's application of Colorado law—including the Colorado Court of Appeals' decision in *Scholle v. Delta Air Lines*--to Plaintiff's claim.  [#51-1 at 42]  Plaintiff contends that Defendant "[has] not explain[ed] how [its] decision to not follow [*Scholle*] impacted the analysis or the final decision that Plaintiff was 'amply compensated' already."  [#53 at 21 n.8]  Even if true,[17] as Defendant points out, Plaintiff "will have the opportunity to depose [Defendant] and its claims adjuster to fully understand its investigation and evaluation."  [#51 at 35 n.14]  If Defendant (and its adjuster) respond to Plaintiff's requests for information concerning the basis for Defendant's evaluation of Plaintiff's claim by asserting that their evaluation was "based on the advice counsel gave us" as Plaintiff anticipates [#53 at 4 n.1], Plaintiff may then renew his waiver argument. Indeed, Plaintiff's brief seems to acknowledge that his waiver argument is premature. [#53 at 21 (arguing that "*[e]ven if* the insurer relied on counsel to decide whether to pay the claim or deny it on legal grounds, and even if that communication could be privileged in the first instance, it *would likely create* an at-issue waiver" (emphasis added))]

---

artificially bolster the credibility of those decisions in the eyes of the jury."  [#53 at 14 n.6] As discussed above, however, Plaintiff provides no citation to the record to support a finding that—outside the context of this discovery dispute—Defendant has referred to Mr. Olvera's legal advice in support of its coverage decision.  *See* note 13.

[17] The Court notes that the October 4, 2019 letter explains that, "[n]otwithstanding the *Scholle* case, [Defendant] still believe[s] that the non-duplication of benefits language in the Alaska National Colorado UIM endorsement [which was attached to the letter with relevant language highlighted] may apply because [Defendant] is providing both UIM and workers' compensation coverage to [Plaintiff] under policies purchased by [his] employer." [#51-1 at 42]

### d.   Conclusion

The Court thus does not find persuasive any of the parties' arguments for the adoption of a bright-line rule universally applicable to all of the documents withheld or redacted based upon Mr. Olivera's involvement in Plaintiff's insurance claim.  Instead, the Court finds that each document withheld or redacted must be individually evaluated to determine whether the document relates to the provision of legal advice and thus is privileged or whether the document relates to Mr. Olivera's performance of tasks associated with adjusting Plaintiff's claim and thus are not privileged.  In the attached Appendix A, the Court—without repeating the findings set forth above and with attention paid to avoiding the disclosure of any information that Defendant may consider privileged—provides its ruling with regard to each entry on Defendant's privilege log.[18]

### B.   Work Product

#### 1.   Legal Standard

"Unlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. P. 26(b)(3)." *Frontier Ref., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998) (quoting *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir.1988)).  Pursuant to Rule 26(b)(3)(A), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its

---

[18] Because, for the reasons stated above, the Court has concluded that, at this stage, there has been an insufficient showing that Defendant is relying upon an advice of counsel defense, is unreasonably relying upon the privilege to avoid explaining the basis for its coverage decision, or has otherwise waived the privilege, the Court does not address Plaintiff's waiver arguments with regard to each specific document that the Court finds was properly withheld or redacted on the basis of attorney-client privilege.

representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," unless "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Even where a court orders the production of work product protected materials, however, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Rule 26(b) thus "contemplates a sequential step approach to resolving work product issues," as follows:

> First, the party seeking discovery must show that the subject documents or tangible things are relevant to the subject matter involved in the pending litigation and are not privileged. Once such a showing has been made, the burden shifts to the party seeking protection to show that the requested materials were prepared in anticipation of litigation or for trial by or for the party or the party's attorney, consultant, surety, indemnitor, insurer or agent. Such a showing may be made by affidavit, deposition testimony, answers to interrogatories, and the like. If the Court concludes that the items were prepared in anticipation of litigation, the burden shifts back to the requesting party to show: (a) a substantial need for the materials in the preparation of the party's case; and (b) the inability without undue hardship of obtaining the substantial equivalent of the materials by other means. Finally, even if substantial need and unavailability are demonstrated, the Court must distinguish between factual work product, and mental impressions, opinions, and conclusions, for the latter are rarely, if ever, subject to discovery.

*Martin v. Monfort, Inc.*, 150 F.R.D. 172, 172-73 (D. Colo. 1993) (citations omitted).

The work product doctrine does not protect documents from discovery unless they were prepared in anticipation of litigation. *See Colorado Mills*, 2013 WL 1340649, at *2. The doctrine, however, "is not confined to situations in which litigation is certain." *Collardey v. All. for Sustainable Energy, LLC*, 406 F. Supp. 3d 977, 982 (D. Colo. 2019). Nor must litigation necessarily "be imminent," instead "it must only be reasonably

foreseeable."[19]  *Masters v. Gilmore*, No. 08-CV-02278-LTB-KLM, 2009 WL 4016003, at

*3 (D. Colo. Nov. 17, 2009); *see also Curtis Park Grp., LLC v. Allied World Specialty Ins.*

*Co.*, No. 1:20-CV-00552-CMA-NRN, 2020 WL 5406130, at *5 (D. Colo. Sept. 9, 2020)

("Litigation need not necessarily be imminent as long as the primary motivating purpose

behind the creation of the document was to aid in possible future litigation.").

To determine whether the "in anticipation of litigation" requirement has been met,

""[t]he test should be whether, in light of the nature of the document and the factual

situation in the particular case, the document can fairly be said to have been prepared or

obtained because of the prospect of litigation." *Martin*, 150 F.R.D. at 173 (quoting 8

Wright & Miller, *Federal Practice & Procedure* § 2024, at p. 198) (emphasis omitted).

"Determining whether anticipated litigation is the driving force behind the preparation of

---

[19] Although as a general principle under the federal work product doctrine, the anticipated litigation need only be "reasonably foreseeable" rather than "imminent," the Court notes that the standard may be different where, as here, an insurer is asserting the work product doctrine over documents related to the insurer's pre-litigation adjustment of an insurance claim.  In *Hawkins v. Dist. Court In & For Fourth Judicial District*, the Colorado Supreme Court held that "[b]ecause a substantial part of an insurance company's business is to investigate claims made by an insured against the company . . ., it must be presumed that such investigations are part of the normal business activity of the company" and thus "the insurance company has the burden of demonstrating that . . . when the documents were prepared or obtained, there was a substantial probability of *imminent* litigation over the claim."  638 P.2d 1372, 1378-79 (Colo. 1982) (emphasis added).  Although *Hawkins* was applying the Colorado—rather than the federal—work product doctrine, numerous decisions in this District have applied the "imminent litigation" standard from *Hawkins* without addressing the potential tension with the general rule that the anticipated litigation need only be reasonably foreseeable rather than imminent.  *See, e.g.*, *Martinez*, 2015 WL 5915415, at *5; *Plaza*, 2015 WL 3528336, at *6; *Colorado Mills*, 2013 WL 1340649, at *6; *Markwest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, No. 05-CV-01948-RPM-KLM, 2008 WL 220726, at *1 (D. Colo. Jan. 25, 2008); *Stillwell*, 1989 WL 78159, at *3.  The Court finds it unnecessary to resolve that potential tension here, because the Court's conclusions would not differ regardless of whether the Court applied the "reasonably foreseeable" or "imminent" standard.  For purposes of the current dispute, the Court thus applies the more lenient "reasonably foreseeable" standard.

each requested document is the central inquiry in resolving work product questions." *Colorado Mills*, 2013 WL 1340649, at *6 (quoting *Smith v. Marten Transp., Ltd.*, No. 10–cv–00293–WYD–KMT, 2010 WL 5313537, at *3 (D. Colo. Dec.17, 2010)).

### 2. Application

Defendant contends that it "began anticipating litigation as soon as Plaintiff's counsel sent an unsubstantiated $500,000 demand in June 2018." [#51 at 34] Defendant's contention must be evaluated in the context of "the factual situation" presented. *Martin*, 150 F.R.D. at 173. Plaintiff's June 2018 demand was made in response to repeated requests from Mr. Millar and Mr. Millar's claim notes indicate that he was waiting to receive the demand from Plaintiff prior to completing his evaluation of Plaintiff's claim. [*See, e.g.*, AlaskaNational_000409 (11/27/2017 email from Mr. Millar to Ms. Anzalone stating that the UIM benefit under the policy had been "successful[ly] trigger[ed]" and stating that Defendant "look[ed] forward to receiving [Plaintiff's] outlined demand"); AlaskaNational_000408 (2/09/2018 claim note stating: "No demand as of today . . . Plan of Action: f/u with plaintiff counsel on UIM demand"); AlaskaNational_000407 (3/20/2018 claim note stating: "Plan of Action: Secure additional medical records and demand"); AlaskaNational_000406 (5/30/2018 claim note stating that Ms. Anzalone "has indicated [Plaintiff] has returned for treatment" and describing the "Plan of Action" as "[m]onitoring file for updated response from plaintiff")] Based upon the nature of the documents in the claim file and the surrounding facts, it thus is clear that, at the time Plaintiff submitted the June 2018 demand, Defendant was still in the process of investigating and evaluating Plaintiff's claim.

The invocation of the work product doctrine by an insurer to protect documents created during the investigation and evaluation of an insurance claim presents unique challenges.  Particularly in the context of a UIM claim, there is almost always the potential for litigation to follow from the insured's claim.  *See Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649, 657 (Colo. 2012) (finding that a UIM claim "places the insurance company in the 'unique role' of becoming almost adversarial to its own insured").  Despite this potential, courts consistently have rejected the argument that "any investigation undertaken by the insurer and all associated documents are made in anticipation of litigation," because "there is always the possibility that [a] claim will end in litigation."  *Hill v. W. Door*, No. 04-CV-00332-REB-CBS, 2005 WL 8171443, at *3 (D. Colo. Aug. 1, 2005) (collecting cases).  Accepting such an argument would improperly "allow an insurance company to insulate all investigative materials generated in every case involving serious injuries long before any coverage decisions are made or threats of litigation arise." *Cornhusker Cas. Co. v. Skaj*, No. 11-CV-110-S, 2012 WL 12541136, at *2 (D. Wyo. Apr. 5, 2012).

Courts thus have recognized that "[b]ecause a substantial part of an insurance company's business is to investigate claims made by an insured against the company or by some other party against an insured, it must be presumed that such investigations are part of the normal business activity of the company and that reports and witness' statements compiled by or on behalf of the insurer in the course of such investigations are ordinary business records as distinguished from trial preparation materials."  *Hawkins v. Dist. Court In & For Fourth Judicial Dist.*, 638 P.2d 1372, 1378 (Colo. 1982).  "This is not to say, however, that under appropriate circumstances an insurance company's

investigation of a claim may not shift from an ordinary business activity to conduct 'in anticipation of litigation'" but "there is no bright line which will mark the division between these two types of activities in all cases." *Id.* With these considerations in mind, courts have held that, to avail itself of work product protection for documents created during the investigation and adjustment of the claim, "the insurance company has the burden of demonstrating that the document was prepared or obtained in order to defend the specific claim which already had arisen and, when the documents were prepared or obtained, there was a substantial probability of . . . litigation over the claim."[20]  *Id.* at 1379.

Here, Defendant argues that Mr. Olivera's declaration provides "undisputed evidence proving" that Defendant began anticipating litigation upon receipt of Plaintiff's demand in June 2018.  [#51 at 34]  The Court disagrees.  All three of the cited paragraphs of Mr. Olivera's declaration include the same vague and conclusory statement:[21]  "I also conveyed my opinions on preparing for litigation, which I and [Defendant] anticipated."[22] [#51-3, ¶¶ 11(n), (o), (q)]  Mr. Olivera's conclusory statements are insufficient for the court to conclude that Defendant actually anticipated reasonably foreseeable litigation upon receipt of Plaintiff's demand.  Instead, based upon the factual situation and the nature of

---

[20] Although *Hawkins* applied the Colorado work product doctrine, as observed above, numerous courts in this District have relied upon these principles from *Hawkins* in cases applying the federal work product doctrine.  [*See supra* note 19]

[21] Defendant's Brief also cites Paragraph 11(f) of Mr. Olivera's declaration, but that Paragraph addresses communications on September 6, 2017 regarding "which jurisdiction's law will apply to [Plaintiff's] UIM claim" and makes no mention of anticipated litigation.   [*See also* AlaskaNational_000412 (redacted claim note for 9/06/2017 communications)]

[22] The Court further notes that the first of these conclusory statements is made in reference to a conversation between Mr. Olivera, Mr. Millar, and another representative of Defendant on August 24, 2018—over two months after the demand letter was received by Defendant.  [#51-3, ¶ 11(n)]

the documents surrounding the communications referenced by Mr. Olivera,[23] as the full text of Mr. Olivera's declaration itself indicates, these communications appear to have focused primarily—if not exclusively—on how Defendant should "proceed[ ] with [Plaintiff's] claim." [#51-3, ¶¶ 11(n), (o), (q); *see also* AlaskaNational_000399 (8/24/2018 claim note discussing the EUO and the need for additional information without any reference to anticipated litigation)]

Defendant further contends that its actions upon receiving the demand support a finding that it anticipated litigation. [#51 at 34-35] First, Defendant contends that, in response to the demand letter, it had Mr. Olivera "replace Mr. Millar as the primary point of contact for Plaintiff's counsel." [*Id.* at 34] There is no evidentiary support in the record, however, to support a finding that Defendant made Mr. Olivera the primary contact because it anticipated litigation. To the contrary, in the contemporaneous documents, Mr. Millar represented that Defendant "retained [Mr.] Olivera . . . to work with [Ms. Anzalone] to get the EUO and any IME promptly completed." [#51-1 at 41] Mr. Olivera then "t[ook] the lead" and "coordinate[d]" the EUO, IME, and mediation with Ms. Anzalone

---

[23] Although Mr. Olivera's declaration includes references to communications he purportedly had with Defendant on specific dates to "identif[y], and provide[ ] context for, certain specific documents that were generated in connection with [his] work," Mr. Olivera does not cross-reference (by Bates number or otherwise) the documents that purportedly relate to those communications. [#51-3, ¶ 11] Paragraphs 11(o) and 11(q) of Mr. Olivera's Declaration describe communications that allegedly occurred on September 14, 2018 and January 4, 2019, respectively, but none of the documents included on Defendant's privilege log bears either of those dates. Nor do the claim notes appear to document conversations between Mr. Olivera and Mr. Millar on those dates. [*See* AlaskaNational_000398 (reflecting claim notes for 9/11/2018 and 9/17/2018 with no entries between); AlaskaNational_000393 (reflecting claim notes for 12/28/2018 and 1/15/2019 with no entries between)] These discrepancies further highlight the inadequacy of Mr. Olivera's declaration, standing alone, to prove the contentions for which it is cited.

on behalf of Defendant.  [#53-7 at 2]  Although the EUO, IME, and mediation are all proceedings that the parties appear to agree regularly happen in the ordinary course of adjusting a claim, Defendant now contends that they were all conducted for the dual purpose of adjusting the claim and for purposes of the anticipated litigation.  [#57 at 14-15]  Defendant further contends that the "primary purpose" of involving Mr. Olivera in those proceedings was because it anticipated that litigation would result.  [*Id.*]  Defendant, however, fails to cite any evidence to support a finding that the "primary purpose" of involving Mr. Olivera was because it anticipated litigation (or even to support a finding that it actually reasonably anticipated litigation at the time—*i.e.*, before it had completed its investigation and evaluation of the claim).[24]  Moreover, elsewhere in Defendant's briefing, Defendant represents that it involved Mr. Olivera because it "needed counsel who could advise it as to the unique requirements of handling a claim under Colorado law, due to being an insurance company with no prior Colorado claims" and states that "Mr. Olivera's role in the IME and EUO process was primarily to assist him in providing legal advice regarding [Defendant's] duties under Colorado law."  [#51 at 12, 21 n.5]  Defendant thus did not obtain this advice from Mr. Olivera "because of the prospect of litigation" but rather Defendant needed this advice to adjust Plaintiff's claim regardless of any anticipated litigation.

---

[24]  The only evidence Defendant cites to support a finding that Defendant involved Mr. Olivera because it anticipated litigation at the time are the conclusory statements in Mr. Olivera's declaration addressed above.  [See #57 at 15 (citing #51-3, ¶¶ 11(n), (o))]  The other evidence cited by Defendant makes no mention of any anticipated litigation and instead indicates that Defendant involved Mr. Olivera to ensure that it adjusted Plaintiff's claim "in a manner consistent with Colorado law."  [#51-3, ¶ 11(j); *see also id.* at ¶ 11 (p)]

Second, Defendant argues that its anticipation of litigation is evidenced by the fact that "it received advice from its counsel on numerous occasions regarding avoiding bad faith liability in a <u>lawsuit</u>."  [#51 at 34 (emphasis in original)]  That Defendant wanted to avoid litigation in no way evidences that it reasonably anticipated the prospect of litigation with regard to Plaintiff's claim.  Presumably, an insurer attempts to avoid exposing itself to bad faith liability in adjusting a claim, regardless of whether or not there is "a substantial probability of . . . litigation over the claim."  *Hawkins*, 638 P.2d at 1379.  Indeed, at the point that an insurer anticipates litigation, it often would be too late to avoid exposing itself to such a claim.  Defendant itself acknowledges that throughout the adjustment of a claim, the adjuster "must understand what actions Colorado law deems 'unreasonable' to avoid multiplied benefits and fees." [#51 at 18]  This acknowledgement and the record evidence support a finding that Defendant obtained advice from Mr. Olivera regarding how to avoid bad faith liability, not because it reasonably anticipated that Plaintiff intended to file a lawsuit, but because Defendant had "virtually no history of claims in Colorado and no Colorado offices or infrastructure" and thus was unfamiliar with the requirements for adjusting a claim under Colorado law.[25]  [*Id.* at 19; *see also* #51-3, ¶ 6 (testimony from Mr. Olivera that he understood that Defendant "retained [him] because it ha[d] very few claims in Colorado and, therefore, desired legal advice on Colorado law")]

Third, Defendant contends that its anticipation of litigation is evidenced by the fact that "it discussed with its counsel how Plaintiff would present as a witness in a lawsuit."

---

[25] Notably, none of the record evidence cited by Defendant to support its contention that Mr. Olivera provided Defendant advice on how to avoid bad faith liability indicates that Defendant actually anticipated that Plaintiff intended to file a lawsuit.  (*See* AlaskaNational_000397 (10/22/2018 claim note); AlaskaNational_000406 (6/25/2018 claim note), AlaskaNational_002358 (3/18/2019 Serious Loss Report No. 1).

[#51 at 34]   Defendant, however,   provides no authority for the proposition that Defendant's own consideration of its risk *if* the matter were to go to trial is sufficient to demonstrate that Defendant actually anticipated litigation.   Nor is there any indication in the cited claim note that Defendant actually anticipated that Plaintiff intended to file a lawsuit in the foreseeable future.[26]   [AlaskaNational_000399 (8/24/2018 claim note)] Indeed, at the time of this discussion, Defendant had not yet obtained an IME or otherwise completed its investigation and evaluation of the claim.   [*Id.*]   That Defendant—as part of its evaluation of the value of Plaintiff's claim—may have considered its potential litigation exposure provides no evidence that Defendant was actually anticipating that Plaintiff would file a lawsuit in the foreseeable future.

The Court having rejected these arguments, Defendant is left with its contention that Plaintiff's June 2018 demand alone "cause[d] [Defendant] to anticipate litigation." [#57 at 15]   Specifically, Defendant argues that, upon receiving Plaintiff's June 2018 demand, "it was objectively reasonable for [it] to believe that litigation was imminent," because the demand (1) was sent by an attorney, (2) requested a large amount of benefits—$500,000—"without significant supporting documentation," and (3) "specifically mentioned proceeding to <u>litigation</u> if the parties did not resolve the claim."   [#57 at 16 (emphasis in original)]   Based upon the nature of the documents and the factual situation

---

[26] This discussion of how Plaintiff would present as a witness occurred during a conversation in which Mr. Olivera conveyed to Mr. Millar and one of Defendant's in-house counsel what had occurred at the EUO Mr. Olivera conducted.   [AlaskaNational_000399] Because it appears that no representative of Defendant other than Mr. Olivera attended the EUO, it is unsurprising that Mr. Olivera relayed his impressions of how Plaintiff would present as a witness.   Particularly in that context, the discussion of how Plaintiff would present as a witness does not in any way imply that Defendant actually anticipated litigation at that time.

in this case, the Court does not find any of these alleged facts—standing alone or taken together—sufficient to establish that Defendant reasonably anticipated litigation in the foreseeable future.

The court acknowledges that, in certain contexts, the retention of an attorney may indicate that a party intends to pursue litigation.[27]  Here, however, Plaintiff retained an attorney to handle his insurance claims before he had even submitted a claim to Defendant.  [#51-1 at 2-3]  It is neither unusual nor indicative of an intent to pursue litigation that Plaintiff retained counsel to handle his insurance claims, particularly given the substantial injuries Plaintiff sustained and the complexity of those claims, which, in addition to the UIM claim, involved a claim for worker's compensation benefits and a claim against the other driver's liability insurer.  *See Church Mut. Ins. Co. v. Coutu*, No. 17-CV-00209-RM-NYW, 2018 WL 2388555, at *5 (D. Colo. May 25, 2018) (finding that "[t]he mere retention of counsel"—even one with a reputation for being litigious—"is . . . insufficient to establish a reasonable anticipation of litigation").

Although Defendant now contends that Plaintiff's June 2018 demand was "unsubstantiated" [#51 at 34], Defendant does not provide any contemporaneous evidence indicating either that Defendant thought the amount of the demand was unreasonable or that Defendant anticipated litigation as a result of the demand.[28]  *See*

---

[27] Defendant cites *Wikel v. Wal-Mart Stores, Inc.* for the proposition that "[t]he involvement of an attorney makes it more likely than not that the focus has shifted toward litigation, making materials more likely to have been prepared in anticipation of litigation."  197 F.R.D. 493, 495 (N.D. Okla. 2000).  *Wikel* recognized, however, that the "[i]nvolvement of an attorney is not dispositive of the 'in anticipation of litigation' issue."  *Id.*  Moreover, here, Plaintiff's retention of an attorney did not reflect a "shift[ ] toward litigation" as Plaintiff retained counsel prior to even submitting a claim to Defendant.

[28] Notably, Mr. Millar's communications with Mr. Olivera immediately following receipt of Plaintiff's demand do not indicate that Mr. Millar found the demand unreasonable or

*Coutu*, 2018 WL 2388555, at *5 (finding that insurer failed to demonstrate anticipation of litigation where there was "no contemporaneous retention letter" indicating that attorney "was retained to provide specific advice because [the insurer] reasonably anticipated litigation" and none of the "correspondence exchanged between [the insurer and the attorney], as reviewed *in camera*, establish that [the insurer] reasonably anticipated litigation"). Instead, Mr. Millar's July 7, 2018 email response to Ms. Anzalone stated: "Before responding to [the] demand, . . . [Defendant] need[s] to do some additional investigation and collect more information." [#51-1 at 41] Nor is it clear that Defendant would even have had a good faith basis for believing that the demand was unsubstantiated at the time the demand was made. *See Nat'l Farmers*, 718 P.2d at 1048 (finding that insurer failed to establish that it anticipated litigation based upon a demand letter submitted before the insurer had concluded its evaluation of the claims, because "until the investigation was completed and the reports submitted, [the insurer] was itself uncertain whether or not it would deny the claim").[29] Plaintiff included in the demand letter additional medical records and other information related to the valuation of his claim. [#51-1 at 20-21] Moreover, at the time the demand was made, Defendant had not yet

---

unsubstantiated or that he was anticipating litigation. [*See* AlaskaNational_000405-AlaskaNational_000406]

[29] In its Reply, Defendant notes that *National Farmer* was not applying the federal work product doctrine, but Defendant fails to identify any difference between the Colorado work product doctrine and the federal work product doctrine relevant to this portion of the Colorado Supreme Court's analysis in *National Farmer*. [#57 at 16] Defendant also seeks to distinguish *National Farmer* by contending that "there was no indication [in *National Farmer*] that an attorney drafted the demand letter, that it mentioned litigation, or that it requested an unsubstantiated amount of insurance benefits." [*Id.*] For the reasons articulated herein, the Court does not find any of these alleged differences to merit a different result.

obtained an EUO or IME and Mr. Millar had not yet prepared a serious loss report.  [#51-1 at 22, 41]

Although Defendant contends that the demand letter "specifically mentioned proceeding to litigation" if the parties were unable to resolve the claim [#57 at 16 (emphasis omitted)], the demand letter did not overtly threaten litigation [#51-1 at 13-21]. Rather, the letter thanked defendant for its "anticipated cooperation in evaluating [the] claim" and stated only that Plaintiff "look[ed] forward to hearing from [Defendant] in hopes to amicably resolve [the] claim short of litigation."  [*Id.* at 21]  The Court does not find this reference to the hope for *avoiding* litigation made at the commencement of the negotiation process for the claim sufficient to demonstrate that there was "a substantial probability of . . . litigation over the claim."[30]  *Hawkins*, 638 P.2d at 1379.  Notably, neither the claim notes nor Mr. Millar's written communications with Mr. Olivera concerning the demand mention a threat of litigation from Plaintiff or otherwise indicate that Defendant anticipated that Plaintiff intended to file litigation.  [*See* AlaskaNational_000406 (6/25/2018 claim note)]

The Court thus concludes that Defendant has failed to establish that Plaintiff's June 2018 demand letter caused it to anticipate reasonably foreseeable litigation.[31]  Plaintiff

---

[30] Because, as explained above, there is almost always the possibility that an insurance claim—particularly a UIM claim—will result in litigation, accepting Defendant's argument that this passing reference to avoiding litigation is sufficient would improperly "allow an insurance company to insulate all investigative materials generated in every case involving serious injuries long before any coverage decisions are made or threats of litigation arise."  *Cornhusker Cas. Co.*, 2012 WL 12541136, at *2.

[31] The Court notes that, even if Defendant had established that it reasonably anticipated litigation upon receiving Plaintiff's June 2018 demand, Defendant would still need to establish that each of the documents it has withheld or redacted on the basis of the work product doctrine "can fairly be said to have been prepared or obtained because of the prospect of [that] litigation."  *Martin*, 150 F.R.D. at 173 (emphasis omitted); *see also*

argues that "there was virtually no chance of litigation . . . unless and until the insurer responded and denied the claim" which Plaintiff contends "did not happen [here] until the denial letter of October 4, 2019."[32]  [#53 at 18]  Based upon its review of the complete claim file provided to the Court for *in camera* review, the Court agrees that Defendant's October 4, 2019 letter is the point at which Defendant appears to have completed its investigation and evaluation of Plaintiff's claim and thus the point at which it may have shifted from a focus on its adjustment of the claim to an anticipation of litigation of the claim.[33]

A detailed analysis of the communications between Defendant and Plaintiff prior to the October 4, 2019 letter supports this conclusion.  In January 2019, Mr. Olivera asked Ms. Anzalone whether Plaintiff "ha[d] any interest in further settlement discussions, or if the case [would] move into litigation."  [#53-4 at 11]  Ms. Anzalone responded within minutes that Plaintiff had recently had an MRI and was consulting with a doctor about the

---

*Kannaday v. Ball*, 292 F.R.D. 640, 649 (D. Kan. 2013) ("The fact that a party anticipates litigation does not make *all* documents thereafter generated by or for its attorney automatically protected under the work-product doctrine".).

[32] Defendant objects to Plaintiff's characterization of the October 4, 2019 letter as a "denial letter."  [#51 at 25 ("[Defendant] did not deny Plaintiff's claim.  Rather, it acknowledged coverage and paid Plaintiff $150,000 for his injuries.")  Instead, Defendant contends that the October 4, 2019 letter "informed Plaintiff that its valuation of the claim did not support more than $250,000 in damages" but "did not refuse Plaintiff's request for additional benefits."  [*Id.* at 25 n.8]

[33] Although Defendant has not expressly proposed an alternative date for when it anticipated foreseeable litigation, Defendant points out that in early November 2019, Mr. Olivera "was monitoring the Colorado state court dockets to determine whether Plaintiff had filed a lawsuit" and "[p]arties do not check to see if a lawsuit has been filed unless they believe litigation is imminent."  [#51 at 35 (citing AlaskaNational_000196)]  The Court agrees that this is strong evidence that, at that time, Defendant was anticipating imminent litigation.  The absence of any indication in the record that Mr. Olivera was monitoring the court filings prior to Defendant sending the October 4, 2019 letter, provides support for the Court's conclusion that Defendant did not anticipate reasonably foreseeable litigation prior to sending the October 4, 2019 letter.

need for surgery and would have more information after that consultation.  [*Id.*]  On June 4, 2019, Ms. Anzalone provided additional medical records and information concerning Plaintiff's condition and requested "an updated evaluation within 30 days."  [*Id.* at 8]  On June 28, 2019, Mr. Olivera provided "an update on [Plaintiff's] claim" and informed Ms. Anzalone that Defendant needed to retain a different orthopedic surgeon to review Plaintiff's medical records and MRIs in order to complete its "updated evaluation of [Plaintiff's] claim."  [*Id.* at 6-7]  On July 18, 2019, Mr. Olivera stated that, in meeting with the orthopedic surgeon on July 17, 2019, they realized that they had not received a copy of Plaintiff's January 2019 MRI; Mr. Olivera thus requested a copy of that MRI, access to Plaintiff's worker's compensation claims file, and any additional medical records.  [*Id.* at 5-6]  On July 23, 2019, Mr. Olivera confirmed that Defendant now had access to the information it needed to re-evaluate the claim.  [*Id.* at 4]  On August 12 and August 15, 2019, Ms. Anzalone requested an update on the status of Defendant's review of the new medical information.  [*Id.* at 3]  On August 16, 2019, Mr. Olivera provided Ms. Anzalone with two reports from the orthopedic surgeon Defendant engaged to review the MRIs and medical records and stated that he would follow up next week "regarding [Plaintiff's] request that [Defendant] respond to the new information."  [*Id.* at 2]  On August 28, 2019, Ms. Anzalone requested that Mr. Olivera "advise whether [Defendant] will be offering more payment to [Plaintiff] for his UIM claim" by August 30, 2019.  [*Id.* at 2]  On August 30, 2019, Mr. Olivera stated that he had "a call into [his] contact with [Defendant]" and would "follow up with [Ms. Anzalone] next week."  [*Id.* at 1-2]  On September 11, 2019, Ms. Anzalone emailed Mr. Olivera and requested an update.  [*Id.* at 1]  That same day, Mr. Olivera responded that Defendant "will have a decision on a possible new offer

shortly." [*Id.* at 1]  On October 4, 2019, Mr. Millar sent Ms. Anzalone the letter, describing it as "a follow up to the numerous recent emails exchanged by [Ms. Anzalone] and Mr. Olivera." [#53-5]  The letter referenced the orthopedic surgeon's review of the additional medical records and imaging studies provided by Plaintiff and concluded that Plaintiff "ha[d] received fair and reasonable compensation for his liability and UIM claims arising from the accident with the payment of $100,000 from the liability carrier and $150,000 from [Defendant] for the UIM claim."  [*Id.*]  Notwithstanding that conclusion, Mr. Millar stated that Defendant "would like to continue to move this matter towards a compromise resolution" and invited Plaintiff "to submit a reasonable settlement demand."  [#53-5]

None of these communications (or any of the documents over which Defendant asserts the work product doctrine) prior to the October 4, 2019 letter thus even hint at the possibility of litigation.  *See Plaza*, 2015 WL 3528336, at *6 (rejecting work product claim with regard to communications "that d[id] not even hint at the possibility of future litigation").  Instead, it was only after Defendant concluded its investigation and evaluation of the claim and issued the October 4, 2019 letter that any litigation could reasonably have been anticipated.  *See National Farmers*, 718 P.2d at 1048 (finding that "[i]t was only *after* [the insurer] denied the claim that litigation arose" (emphasis in original)); *Century Sur. Co. v. Smith*, No. 14-CV-00947-RM-MJW, 2014 WL 7666061, at *6 (D. Colo. Jan. 21, 2014) ("Ordinarily, the date a claim is denied is the most obvious point at which litigation becomes imminent.").[34]

---

[34] In his briefing, Plaintiff argues that the Court should apply the crime-fraud exception to Defendant's assertion of both the attorney-client privilege and work product protection based upon Defendant allegedly "act[ing] as though it [wa]s continuing to investigate the insurance claim and . . . not advis[ing] the insured it [wa]s actually gathering information to prepare a defense of anticipated litigated claims against it."  [#53 at 10]  As explained

The Court thus concludes that none of the documents withheld or redacted by Defendant that were created prior to October 4, 2019 are entitled to protection pursuant to the work product doctrine.  With regard to documents created after October 4, 2019 that Defendant has withheld or redacted on the basis of the work product doctrine, the Court has conducted an individualized review to determine whether the document "can fairly be said to have been prepared or obtained because of the prospect of [the anticipated] litigation."  *Martin*, 150 F.R.D. at 173 (emphasis omitted); *see also Colorado Mills*, 2013 WL 1340649, at *6 ("Determining whether anticipated litigation is the driving force behind the preparation of each requested document is the central inquiry in resolving work product questions." (quotation omitted)); *Hill*, 2005 WL 8171443, at *2 (finding that work product analysis "depend[s] upon the particular circumstances of a given case and may turn on a document-by-document review").  In the attached Appendix

---

above, however, upon review of the documents submitted for *in camera* review, the Court does not find any evidence that Defendant was gathering information to prepare a defense for anticipated litigation as distinguished from actually continuing to investigate and evaluate Plaintiff's claim as Plaintiff understood.  To invoke the crime-fraud exception, Plaintiff "must present evidence that the allegation of attorney participation in the fraudulent conduct has some foundation in fact."  *Plaza*, 2015 WL 3528336, at *8.  Here, Plaintiff has not come forward with any evidence that Mr. Olivera engaged in fraudulent conduct.  Although, in the context of this dispute, Defendant contends that it reasonably anticipated imminent litigation as of Plaintiff's June 2018 demand, the Court has not found sufficient evidence in the record to substantiate that contention.  Regardless, even if Defendant had anticipated imminent litigation, that is not necessarily inconsistent with Defendant continuing to investigate and evaluate Plaintiff's claim.  Plaintiff's reliance on *Plaza* is misplaced.  In *Plaza*, the court found evidence that the insurer and its counsel "knowingly withheld information that was critical to the [claimants'] decision-making on how best to preserve a future UIM claim that everyone agreed was meritorious" and that the insurer and its counsel "made misleading representations in order to bolster [the insurer's] position in any future UIM case, to the detriment of whomever brought the UIM claim."  2015 WL 3528336, at *16.  Here, Plaintiff has not come forward with any evidence supporting a finding either (1) that Defendant and Mr. Olivera withheld material information or made misleading representations with regard to Plaintiff's claim or (2) that any such misrepresentation or omission prejudiced Plaintiff's claim.

A, the Court—without repeating the findings set forth above and with attention paid to avoiding the disclosure of any information that Defendant may consider protected—provides its ruling with regard to each of those documents.[35]

## III.   CONCLUSION

Accordingly, **IT IS ORDERED** that, as set forth in Appendix A, Defendant shall produce certain of the documents previously withheld or redacted.

DATED:  October 15, 2020                           BY THE COURT:

                                                   s/Scott T. Varholak
                                                   United States Magistrate Judge

---

[35] Because all of the documents that the Court found to properly be protected from production pursuant to the work product doctrine also were protected from production pursuant to the attorney-client privilege, the Court does not reach Plaintiff's arguments with regard to his "substantial need" for the withheld documents.